PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation d/b/a WWW.FORD.COM,<br><br>Defendant. | Case No. 3:23-cv-00598-RBM-JLB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")** |

**INTRODUCTION**

**Defendant Ford Motor Company ("Defendant") secretly enables and allows a third-party spyware company to eavesdrop on the private conversations of everyone who communicates through the chat feature at www.ford.com (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties, who use the private chat data to bombard the unsuspecting visitor with targeted marketing.**

**Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630,** *et seq***.**

**JURISDICTION AND VENUE**

1. Defendant invoked this Court's removal jurisdiction.

2. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3. Defendant is subject to personal jurisdiction because the exercise of jurisdiction over Defendant comports with due process because Defendant has the requisite "minimum contacts" with the state of California, such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of its national website sales to Californians, such that the website "is the equivalent of a physical store in California." Since this case arises out of Defendant's operation of its website directed toward California residents, this Court can "properly exercise personal jurisdiction" over the Defendant. *See Thurston v. Fairfield Collectibles of Georgia*, 53 Cal. App. 5th 1231, 1235 (2020).

**PARTIES**

4. Plaintiff Rebeka Rodriguez ("Plaintiff") is a resident and citizen of California. In early 2023, while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with a

customer service representative of Defendant through the Website chat feature related to Defendant's products offered on the Website. Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

5. Defendant is Delaware for-profit entity and is an American multinational automobile manufacturer headquartered in Dearborn, Michigan. The company sells automobiles and commercial vehicles under the Ford brand, and luxury cars under its Lincoln luxury brand. The company is listed on the New York Stock Exchange and does business in every state and county of the United States. With annual sales of many billion dollars, it is one of the most recognizable brands in the world.

6. Defendant owns, operates, and/or controls the Website.

## FACTUAL ALLEGATIONS

7. CIPA prohibits both the wiretapping of and eavesdropping upon electronic communications without the consent of all parties to the communication. "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device"). "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

8. Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors that their conversations are being recorded, intercepted, and/or eavesdropped upon.[1]

---

[1] https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*CIPA Compliance is not difficult. A business must take certain steps. . .with a chat feature. . .to ensure that it obtains valid consent consistent with the holdings of courts interpreting CIPA.*") (last visited Mar. 2023) (emphasis added).

9. Unlike most companies, Defendant *ignores* CIPA. Instead, Defendant enables and allows an independent third party to eavesdrop upon and record all such conversations. Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions…. **When people are chatting, you have direct access to their exact pain points.**"*). See https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited March 2023) (emphasis added).

10. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate expectations of consumers.

11. To enable the eavesdropping, Defendant has allowed a third party – LivePerson, Inc. ("LivePerson") – to secretly intercept, exploit, and monetize the chat conversations between Defendant and visitors to its Website.

12. LivePerson's chat service is an Application Programming Interface that is "plugged into" Defendant's Website. The chat function runs from the LivePerson's servers but allows for chat functionality on Defendant's Website. In other words, LivePerson runs the Chat service from its own servers, but customers interact with the chat service on Defendant's Website so it appears to users that they are communicating with a company representative of Defendant.

13. Whenever a chat message is sent from a member of the Class to Defendant, it is first routed through LivePerson's server. This enables LivePerson to analyze and collect customer-support agent interactions in real time to create live transcripts of communications as they occur, among other services. Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

14. LivePerson's product is a type of automatic routing software that automatically acquires and transmits user chat communications to LivePerson without any active input from either Defendant's employees, agents, or human representatives.

LivePerson acquires Website visitors' chat communications by first having its software route them to LivePerson's own computer servers that it owns, controls, and maintains. The secret code enables and allows LivePerson to secretly intercept in real time, eavesdrop upon, and store transcripts of consumers' chat communications they think they are having with Defendant only.

15. One might reasonably wonder why LivePerson would be interested in intercepting and recording the website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. As shown below, it is all about money.

16. LivePerson has the capability of using the recorded website chat interactions between Defendant and visitors to the Website for one or more purposes other than to benefit Defendant, a party to such communications.

17. LivePerson's chat software is "integrated" with subsidiaries or divisions of Meta Platforms, Inc. (doing business as "Meta") like Facebook and WhatsApp. *See* https://knowledge.liveperson.com/messaging-channels-facebook.html/ ("The Conversational Cloud seamlessly integrates with Facebook, offering brands the opportunity to reach consumers on one of the largest and most popular social messaging channels in the world.") (last visited Apr. 2, 2024).

18. This integration allows LivePerson to share data with Meta and its subsidiaries, and thus operate as a unified system. According to Bloomberg.com, this is all part of Meta's secret "***plan to profit from private chats.***" *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last downloaded March 2023) (emphasis added).

19. So how does it work? ***First***, Meta identifies "user interests" by monitoring a collection of "offsite" user activity, such as the private chat communications between Defendant and visitors to its Website by "integrating" with LivePerson's software. ***Second***, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. ***Third and finally***, after harvesting the chat transcripts for valuable data, Meta's brands like Facebook and WhatsApp bombard

the unsuspecting Website visitors with targeted advertising.

20. Through the preceding acts, Meta's subsidiary can freely boast that it will "Transform your support center into a profit generator." *See* https://www.kustomer.com/product/customer-service/ (last downloaded March 2023). Indeed, all of the schemers – Defendant, LivePerson, and Meta – all profit from secretly exploiting the private chat data through targeted social media advertising because "Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests."[2]

21. LivePerson's chat transcripts are automatically created and stored by LivePerson for "data harvesting" purposes, which is the process of extracting personal data for business and marketing purposes. *See* https://knowledge.liveperson.com/agent-manager-workspace-manager-tools-for-live-chat-web-history.html/ (last visited Apr. 2, 2024).

22. Indeed, LivePerson has acknowledged on page 15 of its Form-10K filing with the U.S. Securities and Exchange Commission for the fiscal year ended December 31, 2017 ("2017 Form-10K"), that "some states in the United States have enacted legislation designed to protect consumer privacy by prohibiting the distribution of 'spyware' over the Internet. . . . If … the scope of the previously mentioned 'spyware' legislation were changed to include web analytics, such legislation could apply to the technology we use and potentially restrict our ability to conduct our business." *See* https://ir.liveperson.com/static-files/0e3e0971-169d-404f-8453-78f0c809f89a (last visited Apr. 2, 2024). Thus, LivePerson freely acknowledged over seven years ago that

---

[2] *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited March 2023) (emphasis added).

its business includes conducting "web analytics."

23. Page 1 of its 2017 Form 10-K states in relevant part, "According to our internal measures, during 2017, we ***monitored*** an average of 2.6 billion visitor sessions per month across our customers' websites. LivePerson combines this session data with ***conversational transcripts*** and other historical, behavioral, and operational information to develop insights into consumer intent and each step of the customer journey, which leads to optimized campaign outcomes for sales and service transactions." *Id.* (emphasis added).

24. The homepage of LivePerson's website markets LivePerson's services by stating: "Analyze omnichannel conversation data to uncover the wants and needs of your customers. Identify top customer intents and uncover opportunities to continuously improve the customer journey." https://www.liveperson.com/ (last visited Apr. 5, 2024). The homepage of LivePerson's website contains a hyperlink named "Learn more about Conversational Intelligence," which takes the user to a landing page addressing LivePerson's "Conversational Intelligence" suite of software.

25. LivePerson's webpage devoted to the subject of "Conversational Intelligence," states in relevant part, "***Built on one of the world's most extensive customer datasets***, our Conversational Intelligence suite turns your customers' words into actionable data — and dollar signs for your business." https://www.liveperson.com/products/conversational-intelligence/ (last visited Apr. 2, 2024) (emphasis added).

26. Such webpage also advertises LivePerson's web analytics services by stating as follows:

- "Harness your conversational data to drive customer insights, cost savings, and growth." *Id.*
- "Generative Insights delivers conversational insights via an LLM-powered, conversational experience — putting the latest generative AI technology to work for your team." *Id.*

- "Analytics Studio converts the content of your phone calls and messaging customer conversations into actionable data, allowing you to have a deeper understanding of customer behaviors, preferences, and signals across channels." *Id.*

27. LivePerson freely acknowledges that it is a "software-as-a-service (SaaS) provider," as acknowledged on page 1 of its 2017 Form-10K, which means that LivePerson provides services to companies, not just products.

28. LivePerson does more than merely provide a storage function for Website users' chat communications with Defendant. It is more than the proverbial "tape-recorder" in the hand of Defendant. Instead, LivePerson uses its record of Website users' interaction with Defendant's chat feature for data analytics and marketing/advertising to consumers – indeed, that is why Defendant pays LivePerson for its software.

29. LivePerson's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature in real time makes it more than a mere "extension" of Defendant.

30. Given the nature of Defendant's business, visitors may share personal and confidential data and personally identifying information with Defendant via the Website chat feature.

31. In early 2023, Plaintiff visited Defendant's Website and had a brief conversation through the chat feature with a customer representative of Defendant. Plaintiff used a smart phone (a cellular telephone with integrated computers to enable web browsing).

32. Defendant did not inform Class members that Defendant was secretly aiding, agreeing with, employing, or conspiring with LivePerson to intercept and eavesdrop on the conversations during transmission, and then exploit the data for its own gain.

33. Defendant did not obtain Plaintiff's or the Class members' express or

implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.

## CLASS ALLEGATIONS

34. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who, during the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior consent.**

35. <u>NUMEROSITY</u>: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

36. <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

    a. Whether Defendant aided, agreed with, employed, or conspired with a third party in eavesdropping upon and recording communications;

    b. Whether Plaintiff and Class members are entitled to statutory penalties; and

    c. Whether Class members are entitled to injunctive relief.

37. <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

38. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action

litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

39. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

# FIRST CAUSE OF ACTION

## Violations of the California Invasion of Privacy Act

## Cal. Penal Code § 631(a)

40. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

41. Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

42. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic

communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022).

43. LivePerson's software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein. *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

44. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded. Defendant also aided, agreed with, employed, or conspired with at least one third party to wiretap and/or eavesdrop upon such conversations during transmission and in real time by voluntarily embedding the software code for LivePerson's software on Defendant's Website.

45. Defendant knows that LivePerson, through software, captures the electronic communications of visitors to Defendant's Website, and pays LivePerson to conduct these activities.

46. In fact, these are the exact activities for which Defendant contracts with LivePerson in the first place: to intercept consumer data, use it to create digital profiles on consumers, and integrate with other third-parties including Meta's products or other affiliates or partners.

47. Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

48. Defendant's conduct constitutes numerous independent and discrete violations of Cal. Penal Code § 631(a), entitling Plaintiff and Class members to injunctive relief and statutory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;
2. An order declaring Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
5. Statutory damages pursuant to CIPA;
6. Reasonable attorneys' fees and costs; and
7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated:  April 5, 2024                         PACIFIC TRIAL ATTORNEYS, APC

By: */s/ Scott J. Ferrell*
Scott. J. Ferrell
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2024, I electronically filed the foregoing **SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Scott J. Ferrell*
Scott J. Ferrell